Next case, Simpson v. Attorney General No. 17-3718 Let me proceed. Are you going to reserve time? Yes, I have, Your Honor. I've reserved five minutes if the court would grant me that indulgence. That's fine. That's fine. Counsel, we're very interested. As you know, we've got a not-for-publication opinion, not-presidential opinion in Taylor, which deals with the standard that we need to apply, willful. It seems that all the circuits are lined up. We don't, again, have a presidential opinion. A place to start is, do you agree with that formulation of willful? I do, and I believe that formulation is that the individual knew of his legal or his or her, let me say, legal obligation and then either purposely disregarded them or acted in plain indifference to them. Now, that obviously brings up a sub-issue. How do we define plain indifference? And as we argued in our brief and as I'd argue today, I'd respectfully suggest that the courts consider adopting the Fourth Circuit's definition from RSM. And in RSM, the Fourth Circuit held, when such errors continue or even increase in the face of repeated warnings given by that the licensee simply does not care about the legal requirements. At that point, the failures show the licensee's plain indifference and therefore become willful. I believe that appropriately encompasses what is plain indifference, because the licensee needs to know of his or her legal obligations and to ensure compliance. And thereafter. Are you asserting that they have to know it, like, by section number? No, Your Honor. I believe they need to have a good understanding of the requirements. And one of the issues. Didn't your client sign repeatedly a document saying, I understand my obligations and I'm going to abide by them? It says that the document, I believe, says we've reviewed it. It doesn't say that he understands it in the same way as the industry operations inspector explains it. And that's part of the difficulty here. When I explain something to the court or the court explains something to me, it's only when we have a conversation about it that we truly understand if the other truly understands the other's understanding of what's being relayed, because otherwise we're left to assume that the other party to the conversation does understand. But we don't know for sure. And that is really the problem here.  Is there a point? Right. There's case law that says it's kind of a fool me once, fool me twice kind of thing. At a certain point, if somebody continues and continues and continues to violate that a logical conclusion is there's plain indifference? I believe, Your Honor, that all the cases cited support that, but with one major caveat, that it's after ATF or the administrative agency comes in, does a compliance inspection, at least for the first time, if not multiple times in the past, the person is warned about their failure in compliance. It is explained. So there's a one free bite rule in your view? Like you're allowed to have as many violations as you want as long as you don't do the same violation again until after the ATF comes out and points it out to you? Because we're talking here with Mr. Simpson. This is Mr. Simpson's case we're talking about at this juncture, right? That is correct, Your Honor. 400 violations. The problem with that argument is they repeat violations and they basically duplicate those violations based on the different arguments that they make. And it's not honestly 400 violations. We address this in our reply brief because we take the position that that's absurd. And what you have, you have industry operations inspectors who at the administrative hearing were not sequestered and could not agree hearing each other's testimony on whether certain things were violations or not. If the administrative agency that is responsible for administering the act can't even train its own employees to understand what the Okay, just take, assume that three-quarters of what they said was wrong. There's still 100 violations, right? I mean, at what point do you say 100 violations? It looks like there's some indifference going on here. I don't believe you have to show that the person did not, in essence, to establish a willful violation, you need to show that they knew what they were doing was wrong. A great example of where I would agree in a first occasion, revocation is appropriate, is if an individual comes in, fills out a form to purchase a firearm, marks off that he or she is a prohibited person, the dealer sees that, the dealer then performs the background check, gets the denial from FBI, and then proceeds to give the firearm to that person, I don't think there's anyone who would disagree whether, no matter how long that entity was in business, that that single violation warrants revocation immediately. And I would agree in that situation that it's appropriate, but in here you have the area supervisor from ATF testify that they had no reason to believe that Mr. Simpson did not intend to comply with the federal law and regulations. What is our function here, the judicial review function? We just need to find that they violated it once willfully, right? One willful violation. We don't use an abuse of discretion standard to decide whether the remedy is proper or not, right? Our function is simply to look at and see whether they were correct or not in terms of whether there was a violation, right? If there was a willful violation, and again, we say based on the record, there's no establishment of a willful violation. Well, address violent fireworks, will you?  Violent fireworks. In that case, didn't we in that explosives fireworks context say, in fact, reject the argument that there had to be some kind of specific ongoing warnings from the ATF? That was an argument that was made, and we said, no, that's not right.  Exactly. But isn't the same logic in play with firearms as with explosives? Again, I think the Congress specifically amended the Gun Control Act in 1986 to add the word willful there. Prior to 1986, willful did not exist in 923E. So the fact that the Congress took that step was to establish that there has to be something more than just violations. We're all on the same page here. We're just trying to find out what constitutes plain indifference, right? Because plain indifference is willfulness. Everybody seems to agree on that, right? And in violent fireworks, correct me if I'm wrong, we were asking that very question, what constitutes plain indifference? And in that context, the argument was made, well, we need to have some kind of warnings. The very argument you're making to us, and I think we said, no, that's not right. You do not have to have any kind of specific ongoing warnings from the ATF to be found plainly indifferent. Now, if that's true when you're talking about things that blow up, why isn't it just as true when you're talking about things that shoot? Because I think it depends also on the context. As I said before, you'd hear no disagreement from me if the individual purposely sold a firearm to a prohibited person that it would warrant, absent being told by ATF previously that that's a violation, that that would be warranted. Here we're talking about complex technical issues that, quite honestly, even ATF doesn't put out in an easy-to-understand format, and licensees are confused. For example, is there evidence that he was told he couldn't sell outside his territory? No. None. No. Okay. And a great example, Your Honor, Industry Operations Inspector Whitman knew about it in advance. She testified to this, and she had no concern to contact him over it. So if this was so blatantly clear to be unlawful, why wouldn't ATF reach out in advance and say, hold on, we got information that you're about to do something that we believe is unlawful. Can you please explain this to us? But that didn't happen. And, again, we have the testimony from the ATF officials themselves that all support the fact. They say, we have no reason to believe that he didn't intend to comply. He was trying to comply. He didn't understand how to. For example, when he received in a receiver that already had all the markings, manufacturing markings, serial number, everything for ATF to trace it, he didn't understand that if he turned that receiver into a rifle, that in his acquisition disposition record, he had to dispose of it to himself, bring it back in as an acquisition, but now as a rifle to be able to dispose to someone else. He wrote in his acquisition disposition record, rifle. He was trying to acknowledge that it changed form, and ATF acknowledged that during the hearing. He just didn't understand the proper way in which, and that's why we get to these. How do you address the multiple occasions on which the forms were filled out, where he filled them out correctly, so it appears he knew what he was doing, and then in other instances, he left things blank, which might have been inconvenient for him to fill out? So, first of all, there were three different individuals who were completing those forms, and we addressed this in our brief. There was Mr. Simpson. I see my time is up. May I continue? I see that there was Mr. Simpson. There was also Gretchen Pryor, who was an employee with a different federal firearms licensee that came and was assisting at such events such as the Alexander Sportsman event, where they built and transferred the guns. There was also Mrs. Simpson. So we had three different individuals completing records, and that's why you do see some discrepancies between them. Also, I would say that with regards to the forms, all the information tended to be there with the forms. Is he responsible for the forms, no matter who's filling them out? Is he the one ultimately responsible for them? Under ATF's position of a responsible person, whoever is in the corporation, LLC, or if it's held individually, that individual person who holds that trade name does become responsible, regardless of whether they know about it or not. That's ATF's position, and there is no definition of responsible person under the Gun Control Act. It's something that ATF has made up out of whole cloth without going through the rulemaking process. I acknowledge there is a definition under the Safe Explosives Act, but they're two completely different acts. As I see my time is up, I will be happy to address any further questions you have during my rebuttal. We'll get you on the rebound. What? I'm sorry? We'll get you on rebuttal. All right. Thank you. May it please the Court, Carlo Marchioli for the government parties. The government, I think, agrees with Mr. Simpson that what this Court said in the Taylor case about willfulness is the correct definition. Thank you. And when it comes to plain indifference, I think the Court can look for guidance to the Safe Code decision from the Supreme Court about 10 years ago, where in that case, the Court said that in the civil context, willfulness equals recklessness. So the government's position is that plain indifference essentially means recklessness. And so when you have a licensee who, it's undisputed, knows at least generally of his legal obligations and knows it's also undisputed about some of those specific obligations, and then for whatever reason, whether it be inconvenience or just not taking the requirement seriously, chooses not to comply, that amounts to recklessness. Why don't you go with one of those direct examples? What's your direct example? An example of him knowing something in advance, and it's undisputed that he knew it, and he violated it. I think the most straightforward example is the firearm transaction records, the 4473s, where he failed to sign a single form. There's also numerous, we're talking dozens upon dozens of places where he did not fill in certain aspects of that form. And if you look at his brief, he does not say that he didn't understand. If you say he didn't sign a single one, isn't the logical argument in response to that is because he didn't understand that. That's not indifference, that's just a mistake. If he signed half of them and he didn't sign half of them, that'd be one thing. But if he didn't sign any of them, isn't the logical conclusion just as strong, maybe stronger, that that's an instance of just not understanding? I think the most logical conclusion is just indifference. So if you look at the 4473, we're talking about a document that is about two and a half pages of information to fill out. It's fairly straightforward. The last block on that form directs the seller to sign and certify that he has no reason to believe that the disposition is unlawful. It's incredibly straightforward. But even to take Your Honor's example about times where he, I'll provide another example. So there are times on the 4473 where there are boxes of information that are completed on some forms, but then on other forms, those same boxes of information are not completed. And we cataloged those instances in our brief. And so that shows that at least in some cases, he understood that that information needed to be completed. But then for whatever reason, on numerous other occasions, he elected not to complete those boxes. And the 4473, I would propose, is one of the most straightforward requirements that a federal firearms licensee has to comply with. It's the bread and butter of what they're doing on a day-to-day basis. How exactly did he know what to do with the form? With the form? Yes. So he met with ATF industry operations investigators on at least three occasions. The acknowledgment forms that are at record page 802 from each one of those encounters indicates that the form was discussed with Mr. Simpson. He initialed next to that indication. He also signed the form. And at the end of the form, he indicated that all these topics were discussed, including the 4473s, and that he understood that the bottom line was, as the licensee, he had the obligation to make sure that he understood what the requirements of federal law were. That's the bottom line here. The obligation was on him. To provide another example of instances in which he clearly understood his obligations, we discuss in the brief that under the dealer's license that he had, there were about 30 to 40 times in his acquisition and disposition book where he did not record all of the information that he needed to record. He does not dispute that fact. Do you agree? I asked Mr. Prince, was there an example where he was told he can't sell out-of-state, and he said, no, there's no evidence of that. I had thought, and you can correct me if I'm wrong, that Industry Operations Investigator Whitman had testified that she told Mr. Simpson that handguns, frames, and receivers could not be sold over-the-counter to out-of-state residents. Am I misremembering? I think that's correct, Your Honor. In addition to her testimony, I believe on each one of the acknowledgment forms that he signed during those meetings with Ms. Whitman and the other investigators, he indicated that he discussed the premises of the business operation with them. Additionally, he applied to move his license in early 2014. That, I think, is almost dispositive evidence that he understood that if he was going to change his location of business, that he needed to get that approval from the ATF. Does the evidence have to be undisputed evidence in order for you to rely on it for a revocation? It does not need to be undisputed. Obviously, like this case, there are going to be instances in which the licensee is saying that he might not have understood something or he might even dispute some of the violations themselves. It doesn't need to be undisputed. In the administrative realm, there can be a hearing, which occurred here. If the licensee chooses to ask for de novo review in district court, the district court has the discretion to hold another hearing, perhaps even a trial, to resolve factual disputes. But in this case, both the government and Mr. Simpson concluded that we didn't want another hearing, and we agreed to resolving the case in the district court on dispositive motions. Now, even if you were to grant that there might be some disputed issues in this case, there are at least some instances in which there are undisputed facts that he knew his obligations and didn't comply with those requirements. So as long as there's at least one of those. Give us your hip parade there, the easiest ones. You only need one, right? That's right. I'd go back to the 4473s. First, you have the fact that he didn't sign those forms. Even if you say that could indicate that he didn't understand what he was supposed to do, I would say at a minimum that's recklessness. But moving on to the other violations on the 4473s, there are dozens of instances in which he did not ensure that all the boxes were completed as he was required. You're saying the inconsistency shows that he understood. Okay. Then you have him dealing firearms in Ridgely, West Virginia, even though, again, he applied to move his licensed operation in 2014, indicating that he knew that he was not allowed to sell firearms away from his licensed operation or a legitimate gun show. Then you also have the instances under the dealer's license where he did not properly record the information that he needed to record in his acquisition and disposition records. And if you look at his brief, he doesn't dispute that those violations occurred. He says that ATF was basing those violations on his use of ditto marks or quotation marks in the acquisition and disposition records. That's not true at all. If you look at the final revocation that was issued by the director of industry operations, he clearly said he was not basing revocation on the use of ditto marks. But that leaves another 30 or so times where he just did not complete the required information in the acquisition and disposition books. Respond to the argument that there's an obligation for ATF that this is a very complex area of the law. There's lots of regulations. There's lots of requirements in that. ATF has a responsibility to educate these people. They're out there in good faith trying to do what they're supposed to do. And you can make a guy an offender for a word, so to speak, or for lack of a word because they don't fill something in just right. So if it's really one misstep in your business and your livelihood is gone, that's too harsh. That can't really be the standard. I don't want to, you know, Mr. Prince is doing a better job of arguing this case than I am, but I take that to be the nature of the argument. What is the government's answer to that, that there's a million different ways somebody can trip up, and if you just fault somebody for making a mistake, that's not willful and that's not playing a difference. That's just heavy-handed government interference in a good faith effort to run a business. So my first response is we're not talking about one, even a handful of mistakes. We're talking about hundreds of violations. Additionally, the bottom line is the obligation that Congress has imposed through the Gun Control Act is on the licensee. As the Supreme Court said in Biswell, when someone chooses to enter a pervasively regulated market, a market that's pervasively regulated for very good reason, the obligation is on the licensee to ensure that he understands those obligations and complies. Did Patel change that in any way? No, not at all. If anything, Patel just confirmed that Biswell remains good law, that the firearms industry is a pervasively regulated industry. Additionally... Does our Vineland Fireworks case have anything to say that's meaningful here? Mr. Prince says that's a different statutory section. Your concurrence had a lot of good things to say, Your Honor. I think it does because Taylor relied on the Vineland case when it articulated the willfulness standard and went along with what the seven or eight other circuit courts have said about willfulness. Vineland also recognized that all the circuit courts that had addressed the definition of willfulness in the firearms context had adopted that definition. Additionally, I think, Your Honor, you made a good point when you were discussing Vineland with Mr. Prince, that I think Vineland did establish that the fact that there aren't prior citations is actually irrelevant to the analysis. The relevant question is whether there was one willful violation on this occasion. And getting back, Judge Jordan, to your question about whether the government has an obligation to educate. Although I don't think the statute or the Attorney General's regulations impose upon the government a duty to educate, it is oftentimes in the government's interest to actually try to educate as much as possible. And that's exactly what you see happened in this case. Industry operations investigators met with Mr. Simpson on numerous occasions to go over the requirements that he had to comply with. But in the end, it was ultimately his obligation to make sure that he complied with those requirements. It's an interesting statutory area. As you know, I know you appear before us a fair bit. A lot of times you're dealing with substantial evidence. There's no particular deference owed to the ATF's decision here, right? That's correct, Your Honor. No particular deference. I think it's something akin to like Skidmore deference in the Chevron context, that you just owe the agency decision as much deference as you think it deserves. I will say, though, that I do think substantial evidence is the correct type of standard to be applying here by a district court because when you look at the ATF regulations as to what's required to revoke, ATF has to find that there is reason to believe that the licensee committed a willful violation. I think that amounts to the substantial evidence standard in this court. Is it de novo review in the district court? In the district court, it's de novo review, but I think that begs the question, what type of standard did ATF apply that the district court then needs to apply de novo? It's not really a disputed issue, at least in the Simpson case, but if the court wants to look at an analysis on the substantial evidence interaction with the de novo review standard in the statute, there's the Steins case from the Seventh Circuit in 1980, which I think was one of the first cases to really deal with the statutory framework and look at the substantial evidence standard. And if you look at the cases, the district court cases especially, in similar situations, most of those cases are talking about substantial evidence. But the reason it's not an issue in this case is because even if the district court was applying a preponderance of the evidence type standard, clearly there's enough evidence here to show that Mr. Simpson willfully violated at least one of the requirements that he had to comply with. If there are no further questions, I would only ask that the court affirm the judgment of the district court. Thank you, counsel. Thank you. May it please the court. I'd like to start with one question, and it's a rhetorical one. But if Mr. Simpson intended to act plainly indifferent to the Gun Control Act and his obligations, why on February 2, 2014, did he specifically ask Industry Operations Inspector Tromm to review his records to ensure his compliance? IOI Tromm testified that that is exactly what Mr. Simpson did. And what did IOI Tromm say? Said that all of his records look good. Told him it was fine. Issued an assignment report saying no violations when 90% plus of the now violations that the government contends occurred were all prior to that. That wasn't an inspection of his records. IOI Tromm was there for a completely different purpose, right? And as you say, Mr. Simpson said my records look okay for you, and Tromm said they look okay to me. But that was not an inspection of the sort that we're here dealing with, which IOI Whitford did. Isn't that the fact? We disagree, because, again, Mr. Simpson doesn't know what a compliance inspection looks like. He's never been through one prior to the April 3, 2014. When IOI Tromm is there for Did you think, is the position you're taking, that he thought when somebody came in to speak to him, and I can't remember, was this in connection with his desire to move his license? Yes, Your Honor. He says, I want to move my license. Somebody goes in to talk to him about that, and he says, hey, take a look at my records. He was under the impression that that was the sort of compliance review that the ATF does for people? Yes. Yes. And IOI Tromm testified on his own that Mr. Simpson asked him to check his records to, quote, ensure his compliance. And IOI Tromm issued an assignment report saying no violations. Now, the government takes the position that it was no violations in respect to a qualifying inspection. If it's a qualifying inspection for a new license, you'd never have violations because the license doesn't even exist to review records in relation to. So the whole argument doesn't make sense, and 923G does not differentiate between different forms of inspections. Whether it was qualifying, whether it was compliance, whatever, when they came there to do the original qualifying inspection, Mr. Simpson asked for help. He wanted to make sure he was doing everything right. He's told he's doing everything right. Then two months later they come back to do what now ATF contends is the first compliance inspection and says, oh, look, look at all these violations that you committed before IOI Tromm looked at your records and told you everything was good. So you're in a position that the owner of a firearms establishment can control what the ATF's purposes are? Because that's what it sounds like you're saying. Somebody from ATF goes in response to a request for a change of location for a license and goes to discuss that with your client. Your client says, hey, how are my records? That if an IOI as a courtesy looks at records and says they look okay to me, that action prevents the ATF from itself under its own schedule and with its own purpose and with its own selected investigators from coming in and looking. I think there's two different issues. One is in plain indifference. The other is in relation to their ability to conduct a warrantless inspection once a year or every 12 months, I think the statute says. It sounds like you're making an argument that's bridging both. You're saying, look, they came in two months later and that wasn't fair, which is your unauthorized search argument. But you also seem to be saying that because he said, hey, take a look, that anything that IOI trommed at that point constituted a blessing, an absolution for your client for anything that may have happened before that point in time. I don't know that it's an absolution of a violation, but what I would say, it clearly shows that the licensee is not acting with plain indifference. If you go to the administrative agency that's responsible for enforcing an act and you say, look, I'm a licensee of yours. I need to know if I'm doing things right. I don't want to violate this act. I want to make sure of my compliance. And they say, yep, you're good. The person has a right to rely on that. Tromm could have said, nope, we don't do this at this point in time, or I am not prepared to do it. I'll send someone out. He didn't do that. He said, let me look. He testified that Mr. Simpson asked him that it was to ensure the accuracy of his records. I see I'm out of time. Obviously, if the court has any further questions, I'm happy to answer them. But we just ask otherwise that the court please reverse the decision, direct the reissuance of his license, and remand it to the district court for discussion and motions on attorney's fees and costs. Thank you, Your Honors. Thank you, Counsel. I will take the case under advisement. We thank counsel for excellent briefing and argument. And we'd also like the other case, I'd like to meet you at sidebar if you're amenable.